JAMES H. VAN ALEN, Respondent, v. THE ILLINOIS CENTRAL RAILROAD COMPANY, Appellant.

Defendant negotiated a loan upon its bonds with a privilege to the bond holders to subscribe to the capital stock of the company, to an amount equal to one-half of the bonds. The plaintiff subscribed for $300,000 of the bonds, and received provisional certificates entitling him, after a certain date, to certificates of the capital stock according to the terms proposed in negotiating the loan. Below the signature of the officers to the certificate was the following: "N. B. The exchange of the provisional certificates for scrip certificates is limited to 1st January, 185 ."

By subsequent resolution of the directors the memorandum was filled out, "1855."

Plaintiff paid up his subscription to the loan before the installments thereto become due, but did not demand the issue of the stock certificates until January 22, 1857, when they were refused.

The premium on the stock at this time over the amount paid (and which, with interest, the plaintiff offered to pay) was $27.50 per share.

The plaintiff brought suit to recover the amount of this premium on the shares claimed by him.

*Held*, that, upon paying all the installments on his subscription to the bonds, the plaintiff's right to the shares of capital stock was absolute, and could not be limited to an election to take the stock on or before a specified date.

The memorandum in blank at the foot of the provisional certificates could not bind the plaintiff to a limitation determined upon after the issue of such certificates.

APPEAL from judgment of Superior Court of the city of New York.

The action was to recover damages for a refusal to issue or deliver to the plaintiff nine hundred and seventy-five shares of the defendant's stock. On the 22d January, 1857, the plaintiff demanded of the defendant nine hundred and seventy-five shares of its scrip stock, claiming a right thereto according to the terms of "provisional certificates" for that amount of stock then held by him and presented to the defendant. The plaintiff at the same time offered to pay to the defendant all installments that had been called upon said stock, with all interest due. The defendant refused to issue

or deliver the stock to the plaintiff, and the plaintiff brought his action for damages. The plaintiff proved that the market value of the stock on the day of the demand and refusal was $27.50 per share above par, and upon that measure his damages for the refusal were $26,812.50, for which sum he had a verdict.

Upon the trial a special verdict was taken, and upon the facts thereon found, and the facts admitted in the pleadings, the plaintiff had judgment for the amount of the verdict and interest and costs. This judgment was affirmed by the General Term of Superior Court on appeal, and the case comes up to this court upon the defendant's appeal from that judgment.

The facts found by the special verdict and admitted by the pleadings, are substantially these: The defendant, in June, 1852, issued a prospectus for a loan of $5,000,000, to be taken in London. This publication or prospectus contained a description of the location and connections of the defendant's proposed railway. It also set forth a grant of land and roadway for the purpose of building the road by the United States to the State of Illinois, and from the latter to the company. It further recited the power of the directors to raise funds necessary for its construction by borrowing them on the bonds of the company, secured by a trust conveyance of the lands. It furnished an extract from a railway journal, showing an increase of the value of lands from railways, and then stated that such grant of land had determined the directors to raise the necessary fund for construction, amounting to $17,000,000, $12,000,000 of which, reserved for subscribers in the United States, had been disposed of. It further stated, that, in order to raise the remaining $5,000,000, the company had authorized their agents in London to negotiate for that amount in bonds, bearing interest at six per cent per annum, interest payable semi-annually; that these bonds would be issued in sums of $500 and $1,000, at a certain rate of exchange, for which provisional certificates to bearer would be issued on the payment of the first deposit, and *on the remaining payments* being completed the provis-

ional certificates would be exchanged for the bonds. This was followed by a tabular statement of the dates and amount of the advance of installments on the bonds, which were ten in number, beginning on the 1st July, 1852, and ending on 2d October, 1854, at intervals of three months, with a provision that the installments might be anticipated by advancing the whole subscription, which would entitle the subscriber to interest at six per cent per annum. It was also provided therein that the bonds were to be redeemable at a certain rate of premium.

It, the proposal in question, then proceeded as follows: "The Illinois Central Railway company having thus decided to raise the money necessary for the construction of the railway by the issue of its bonds secured on the land and railway, will create, notwithstanding, a share capital equivalent in amount to the sum raised on bonds, and which will be issued in $100 shares, to represent the proportionate interest of the respective holders in the undertaking. It is proposed to give the privilege to subscribers to the loan of $5,000,000, now offered, to become shareholders therein for one-half of that subscription ($2,500,000), and, as it can hardly be doubted that the bonds will be paid off by means of the sale of lands, there is every probability that the railroad will be constructed without any call on the share capital. A small deposit may be required on the shares, and these shares will thus become an actual bonus, and entitle the holder to a participation in all the profits of the line. A banker's certificate will be given on payment of the first deposit on the bonds, which will be exchanged for the provisional certificates, as soon as they can be obtained from America, and at the same time a *further* provisional certificate, entitling the bearer, in addition, to fifty per cent on the amount of his subscription to the bonds in the capital stock of the company, will be delivered to him. The provisional certificates will be exchanged for scrip shares on payment of the last installment on the bonds."

The plaintiff subscribed for $350,000 of this loan, and, having assigned $50,000 of the subscription, completed the

same for the residue of $300,000. About the 1st of October, 1852, the plaintiff, on paying the second installment on his subscription to the loan (which was paid in New York, in pursuance of arrangements with defendant), received from the defendant three hundred "provisional certificates," for bonds of $1,000 each. A clause in those certificates was as follows: "After the payment of the last installment, these certificates will be exchanged for the definitive construction bonds." The plaintiff at the same time received from the defendant forty-three "provisional certificates" for stock, amounting to nine hundred and seventy-five shares, in the following form:

"Illinois Central Railroad Company. Provisional cer-tificate, No. —, for —— shares, $100 each. Subscription for —— bonds of $1,000 each, bearing interest at six per cent per annum. Nos. —.

"This certifies that the bearer hereof will be entitled, on and after the 1st day of October next, to scrip certificates for —— shares of one hundred dollars each, on the capital stock of seventeen millions of dollars, of the Illinois Central Railroad Company, on presentation hereof at the office of Messrs. Haywood, Kennards & Co., bankers, London; *Provided*, all the installments on the subscription for the bonds, numbered as above, shall then have been fully paid up.

"OFFICE OF THE ILLINOIS CENTRAL RAILROAD CO., }
    "NEW YORK, August 16, 1852.                           }

"—— ——, *President.*
"——— ———, *Secretary.*

"N. B. The exchange of the provisional certificates for the scrip certificates is limited to 1st January, 185 ."

Subsequently, and by January, 1853, the plaintiff had paid up all the installments on his subscription to the loan.

On the 17th November, 1852, the defendant's board of directors passed two resolutions, of which the first appropriated a certain number of shares for the London subscribers to the loan, and authorized the trustees to assign the proper number to each subscriber to the loan on his surrender of the

provisional scrip certificates held by him, and paying an installment or assessment of five dollars per share; and the second authorized the transmission to such trustees of certificates in blank, properly signed, to be delivered by them to the subscribers.

On the 15th March, 1854, the defendant's board of directors passed certain other resolutions, relating to the time and manner in which subscriptions to the stock of the company should be made, under rights held to that effect, and directing that "notice be given to all persons entitled to the rights aforesaid that the books of the company will be open till the 1st day of January, 1855, and not afterward, for the purpose of making such subscriptions, by publication in not less than two newspapers in each of the cities of New York and Boston, and by addressing a circular notice to the same effect, through the post-office, to each person who shall appear on the books of the company on the 1st day of April next, to be entitled to such rights."

The defendant caused this notice to be published in the newspapers, and copies thereof to be sent by mail to the subscribers to the loan, including the plaintiff, but the plaintiff never received the notice.

The memorandum at the foot of the provisional stock certificates, issued by the trustees in London, was filled up with the year 1855.

In the provisional stock certificates issued to and held by the plaintiff the year on this "memorandum" was left blank. The clause at the foot of each certificate reads as follows: "N. B. The exchange of the provisional certificates for the scrip certificates is limited to the 1st January, 185   ."

Prior to, and on the 1st day of January, 1855, the defendant's stock was under par in market, and it so remained for several months. Subsequently thereto, and prior to the 1st of January, 1856, the defendant issued to subscribers all the shares of stock not previously taken, to complete its full capital of $17,000,000. There had been called and paid upon the shares prior to January 22, 1857, six assessments of five per cent each, amounting to thirty per cent.

On the 22d of January, 1857, the market value of the said shares in the city of New York was $27.50 above the amount of the installments which had been paid in. Before that day the plaintiff had never presented the provisional stock certificates to exchange for scrip certificates, nor paid nor offered to pay any of the installments on the shares for which they were exchangeable. On that day, the plaintiff presented his stock certificates at the office of the defendant in New York, and offered to pay the installments previously called on the shares for which they were exchangeable, with the interest thereon, and demanded the issue of scrip certificates of stock therefor. The defendant admitted the presentation and offer and demand at the New York office, with the same effect as if made at the office of Hayward, Kennards & Co., London, and waived the presentation, offer and demand there, but the defendant declined and refused to accept the offer and deliver the stock, insisting that it was not bound to do so then.

The plaintiff brought suit after this demand and refusal; and, as has been stated, had judgment for $26,812.50, being the difference between the par of the stock and its market value at the time of the plaintiff's demand and the defendant's refusal, on the 22d of January, 1857, with interest from that time.

*William M. Evarts*, for the plaintiff.

*Charles Tracy*, for the defendant.

Wright, J. In January, 1857, the plaintiff demanded from the defendant nine hundred and seventy-five shares of their scrip stock, claiming a right thereto, according to the terms of "provisional certificates" for that amount of stock, then held by him and presented to the defendant. At the same time he offered to pay to the defendant all installments that had been called upon the stock demanded, with all interest due. The defendant refused to issue or deliver the stock to the plaintiff, and this action was brought for damages. The plaintiff had a verdict and judgment for

$26,812.50, being the difference between the par of the stock and its market value at the time of the plaintiff's demand and the defendant's refusal. It is not claimed that this measure of damages is objectionable, if the plaintiff could recover at all. The sole question, therefore, is as to the defendant's liability. If the plaintiff, at the time of the demand, was entitled to nine hundred and seventy-five shares of the defendant's capital stock at par, which they refused to issue or deliver to him, the judgment is right. On the contrary, if he had no title or right to the stock, the judgment on the special verdict ought to have been given for the defendant.

The case, upon the facts admitted and appearing by the special verdict, seems to me to be a plain one, and that but little more than a statement of them is requisite. The defendant, in June, 1852, desiring to borrow $5,000,000 on their bonds to construct their railway, issued proposals for a loan to that amount to be taken in London. The prospectus set forth that they had authorized their London agents to negotiate for the amount in their bonds, bearing interest at the rate of six per cent per annum, payable half yearly in London; which bonds would be issued in sums of $500 and $1,000 each, at a certain rate of exchange. Payments for these bonds, or deposits by lenders of the moneys for them, were proposed to be made at various periods; the first deposit, July 1st, 1852, and the remaining deposits or installments at intervals of three months from that date, and ending on 2d October, 1854; but the installments might be anticipated by advancing the whole subscription, which would entitle the subscriber to interest at six per cent per annum from the date of payment. On the payment of the first deposit on the bonds, "provisional certificates" to bearer would be issued, and, on the remaining payments being completed, the provisional certificates would be exchanged for the bonds. The prospectus in question, after thus giving the terms of such loan, stated that the company would also create a share capital, divisible into shares of $100 each, and went on to say: "It is proposed to give the privilege to

subscribers of the loan of $5,000,000, now offered, to become shareholders therein for half of that subscription ($2,500,000), and as it can hardly be doubted that the bonds will be paid off by means of the sale of lands, there is every probability that the railroad will be constructed without any call upon the share capital. A small deposit may be required on the shares, and these shares will thus become an actual bonus, and entitle the holder to a participation in all the profits of the line." It was further stated that a banker's receipt would be given on payment of the first deposit on the bonds, which would be exchanged for the " provisional certificates " as soon as they could be obtained from America; and at the same time a further "provisional certificate," entitling the bearer in addition to fifty per cent on the amount of his subscription to the bonds in the capital stock of the company would be delivered to him. The " provisional certificates " would be exchanged for scrip shares on payment of the last installment on the bonds."

The plaintiff subscribed for $300,000 of the loan as thus proposed; paying the first installment in London, and the remaining installments in New York, in pursuance of arrangements made with the defendant. About the first of October, 1852, on paying the second installment on his subscription, he received from the defendant three hundred " provisional certificates " for bonds of $1,000 each. The counsel for the defendant errs in his statement that these were the bonds themselves delivered to and accepted by the plaintiff. They were the instruments called a " provisional bond certificate," contemplated by the proposals, that the subscribers to the loan were to receive after depositing the first installment, and were identical in form with those received by other sub-scribers. Each contained a stipulation that " after the payment of the last installment they would be exchanged for the definitive construction bonds." At the same time, the plaintiff received from the defendant, forty-three " provisional certificates " for stock, amounting to nine hundred and seventy-five shares. These provisional stock certificates bore date 16th August, 1852, were signed by the defendant's

president and secretary, and, after specifying the amount
and number of the bonds subscribed for, were in this form:
" This certifies that the bearer hereof will be entitled, on and
after the first day of October next, to scrip certificates for
(a specified number, corresponding with the one-half of the
bonds referred to) shares of one hundred dollars each, in
the capital stock of seventeen millions of dollars of the
Illinois Central Railroad company, on presentation hereof,
at the Messrs. Haywood, Kennards & Co., Bankers, London.
Provided all the installments on the subscription for the
bonds, numbered as above, shall then have been fully paid
up." At the bottom of each of the stock certificates, thus
declared, and below the signatures of the officers of the com-
pany, was this memorandum : " N. B. The exchange of the
provisional certificates for the scrip certificates is limited to
1st January, 185 ." The plaintiff anticipated the payments
of the installments on the loan, paying the last in January,
1853. In January, 1857, he presented to the defendant
the provisional stock certificates issued to and held by him
(offering to pay them all installments that had been called
on the stock, with interest thereon), and demanded his scrip.
They refused to issue or deliver the stock to him.

In view of these facts, I see no ground for any defense.
The defendant, soliciting a loan of money, proposed to give
these bonds to lenders, bearing interest at six per cent per
annum, payable at a certain period, and also give them the
privilege to become stockholders to the amount of half their
subscriptions, promising them, upon paying in the first
installment of the loan (which was proposed to be paid in
installments), certificates entitling the bearer to that amount
in their capital stock, which certificates would be exchanged
for scrip shares on payment of the last installment. The
plaintiff subscribed for $300,000 of the loan. The proposals
and an acceptance thereof by a subscription to the proposed
loan constituted the original contract between him and the
company. The terms of this contract were that the defend-
ant should pay him interest, and should give him, also, an
open, unmolested privilege to subscribe for their capital

stock, at par, whenever he desired to do so. The claim that there was only a right of election, on a fixed date, given to subscribers, whether they would or would not take stock, is not maintainable. It is not a proper construction of the contract created by the proposals and acceptance of them, that the option to take stock was to be exercised on payment (that is, at the time of payment) of the last installment of the loan. When the contract was reduced to certainty, on the 1st October, 1852, by the issue of the provisional bonds and the provisional certificates, no such condition of election, on a fixed day, was prescribed. The provisional bond certificate declared that, " after the payment of the last installment, their provisional certificates will be exchanged for the definitive construction bonds," and the provisional certificates of stock declared " the bearer hereof will be entitled, on and after the 1st day of October next, to scrip certificates for shares." The right to stock, after October 1st, 1852, became precisely as absolute as the right to bonds, after paying in the last installment of the loan. If it were argued that the subscriber had only a right of election to take stock, which he forfeited after a certain date, it must be equally true that he had only a right of election to take bonds, which he forfeited in the same way if he did not take them.

I repeat that I regard the case as a plain one. The plaintiff, by subscribing to the loan solicited by the defendant, purchased, for a valuable consideration, the stock issuable to him as such subscriber, upon the single condition that, before it was so issued, he should have paid in to the defendant the amount of his subscription. Whether the right thus acquired was an actual title to stock, of which the provisional certificate was a sufficient document, or a right to the stock obligatory or optional, such right could be determined, like every other right, only by contract between the parties, or by judgment against the plaintiff.

There is no ground for a pretense that his rights can be affected by the incomplete memorandum at the foot of the stock certificate. This was not filled up with any date in any of the forty-three certificates held by the plaintiff. These

certificates were issued under a resolution of the company, adopted 17th of November, 1852, and when issued they had not determined the filling up of the date; nor did they determine it until March, 1854. Meantime, they had issued these to the plaintiff with the date left blank intentionally. But the company had no power or right to cut off the plaintiff's stock-right by a *notice* of any kind. The delivery and acceptance of these certificates might make a contract, but, if this date had been filled in, the plaintiff might have refused to accept them. Even if it had been filled up, and the plaintiff had accepted them thus, it would have had no more effect than a notice, and it was impossible for the company thus to clear itself of a perfect obligation.

I am of the opinion that the judgment should be affirmed.

All the judges concurring,

Judgment affirmed.